**FILED**

**FOR PUBLICATION**

OCT 12 2022

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATHAN CHENNETTE; LARRY AKINS; GARY ALGER; GABRIEL ANGUIANO; JOSHUA BARKDULL; R. B. BEAL; RORY BOND; VADIM BONDAR; CHRISTOPHER BORGES; CHARLENE BRANHAM; ROGER BURT; ADAM BYERLEY; STEFANIE CHRISTOPHERSON; JASON COULTER; TRAVIS CRONE; JOSE DE LA MORA; STEVEN DICK; GREG DODGSON; BRIANA ETHINGTON; JONATHON FORSYTHE; DAVID FROST; SCOTT GLUBAY; STRYDER HARTLEY; JOSEPH HARTSOUGH; ANDREA HATCH; NATHANIEL HOOD; NICHOLAS JONES; TOM KEFFER; ROGER KENNEDY; MICHAEL LARSON; JONAH LUCHT; CHRISTIAN LYNESS; JONATHAN MCCORMICK; APRIL MICHAEL; NICK MILLER; GABRIEL MIRANDA; ALFONSO MIRANDA; MICHAEL MONZO; JAMES PAYNE; ROBERT PELCHER; SEAN PRIEST; KYLE ROBB; JOHN ROWE; JAKE ROZSA; RON SCHAEFER; OWEN SHAW; GEORGE SIMMONS; MICHAEL SMITH; LEVI STODDARD; JEREMY VOGEL; NICOLE WOOD,<br><br>        Plaintiffs-Appellants, | No. 20-35962<br><br>D.C. No. 1:20-cv-00201-SRB<br><br><br>OPINION |

v.

PORCH.COM, INC.; GOSMITH INC.;
MATTHEW EHRLICHMAN; BRENTON
MARRELLI; DARWIN WIDJAJA,

        Defendants-Appellees.

Appeal from the United States District Court
for the District of Idaho
Stephen R. Bough, District Judge, Presiding

Argued and Submitted October 4, 2021
Portland, Oregon

Before:  William A. Fletcher, Sandra S. Ikuta, and Daniel A. Bress, Circuit Judges.

Opinion by Judge W. Fletcher;
Concurrence by Judge Bress;
Partial Dissent by Judge Ikuta

# SUMMARY[*]

## Telephone Consumer Protection Act

The panel reversed the district court's judgment dismissing a complaint, brought by 51 individuals who are home improvement contractors, alleging violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227(b) and (c); and remanded.

Defendants are GoSmith, Inc., Porch.com, Inc. (which acquired GoSmith), and three individual corporate officers.

The TCPA prohibits calls using automatic telephone dialing systems ("ATDS") to cell phones, *see* 47 U.S.C. § 227(b), and telephone solicitations sent to residential telephone subscribers who have registered their phone numbers on the national do-not-call registry, *see* 47 U.S.C. § 227(c). Both provisions provide private causes of action for damages and injunctive relief.

The complaint alleges that defendants' use of ATDS to plaintiffs' cell phones violated (and continues to violate) § 227(b); and that defendants' text messages to plaintiffs' cell phones that were (and are) registered on the national do-not-call registry violated (and continue to violate) § 227(c). The district court assumed that plaintiffs have Article III standing but held they lack statutory standing.

Defendants argued that plaintiffs lack Article III standing because they have solicited business inquiries from potential customers and therefore have not suffered a concrete and particularized injury in receiving solicitations from defendants. The panel disagreed, noting that plaintiffs did not expressly consent to receive text messages from GoSmith, which sought to sell information about potential clients, and their alleged injuries are particularized.

The panel also held that plaintiffs have statutory standing under § 227(b) and (c) of the TCPA. Defendants argued that the TCPA protects only individuals from unwanted calls, and that plaintiffs, as home improvement contractors, fall outside of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

TCPA's zone of interest. Because the statutory text includes not only "person[s]" but also "entit[ies]," the panel concluded that all of the plaintiffs have standing to sue under § 227(b) of the TCPA.

Those plaintiffs who have placed their cell phone numbers on the national do-not-call registry allege additional claims under § 227(c). Noting, correctly, that § 227(c) and its implementing regulations apply only to "residential" telephone subscribers, defendants argued that because plaintiffs use their cell phones both for personal calls and for calls associated with their home improvement businesses, they do not qualify as residential subscribers. The disputed question was whether a cell phone that is used for both business and personal purposes can be a "residential" phone within the meaning of § 227(c). The panel noted that in the view of the Federal Communications Commission (FCC), a subscriber's use of a residential phone (including a presumptively residential cell phone) in connection with a home-based business does not necessarily take an otherwise residential subscriber outside the protection of § 227(c). Relying on the FCC's regulations and orders, the panel concluded that a presumptively residential cell phone can be residential even when used for both personal and business purposes. In the absence of FCC guidance on the precise question of when a mixed-use phone ceases to become a residential phone or a business phone, the panel held that plaintiffs' registered cell phones that are used for both personal and business purposes are presumptively "residential" within the meaning of § 227(c). At the motion to dismiss stage, the panel therefore concluded that these plaintiffs have standing to sue under § 227(c). The panel wrote that after discovery, defendants may seek to argue that they have rebutted the presumption by showing that plaintiffs' cell phones are used to such an extent and in such a manner as to be properly regarded as business rather than "residential" lines.

Concurring, Judge Bress wrote to address the dissent's claims that the majority "usurps the role of the Federal Communications Commission" and enacts a regulatory framework that is based on the majority's "own policy preferences." He wrote that the majority opinion is correct to conclude that wireless users may be "residential subscribers" depending on how they use their phones; and that this conclusion is supported by the FCC's guidance, the conclusions of other courts, and plain common sense.

Dissenting in part, Judge Ikuta wrote that the majority usurps the role of the FCC and creates its own regulatory framework for determining whether a cell phone is actually a "residential telephone," instead of deferring to the FCC's narrower and more careful test.

# COUNSEL

James S. Wertheim (argued), LawHQ PC, Pepper Pike, Ohio; Thomas Alvord, Rebecca A. Evans, and Crystal L. Cooke, LawHQ LLC, Salt Lake City, Utah; for Plaintiffs-Appellants.

Benjamin G. Shatz (argued) and Christine M. Reilly; Manatt, Phelps & Phillips LLP, Los Angeles, California; Kristin E. Haule, Greenberg Glusker Fields Claman & Machtinger LLP, Los Angeles, California; for Defendants-Appellees.

W. FLETCHER, Circuit Judge:

The Telephone Consumer Protection Act ("TCPA") prohibits certain unsolicited telephone calls. As relevant here, the TCPA prohibits calls using automatic telephone dialing systems ("ATDS") to cell phones, *see* 47 U.S.C. § 227(b), and telephone solicitations sent to residential telephone subscribers who have registered their phone numbers on the national do-not-call registry, *see id.* § 227(c). Both subsections provide private causes of action for damages and injunctive relief. Plaintiffs-appellants ("plaintiffs") filed suit against defendants-appellees ("defendants") alleging violations of § 227(b) and (c). The district court assumed that plaintiffs have Article III standing but held that they lack statutory standing. It did not reach other questions presented. We have jurisdiction under 28 U.S.C. § 1291 and reverse.

## I. Background

We take as true the factual allegations in plaintiffs' complaint. Plaintiffs Nathan Chennette and fifty other individuals are home improvement contractors. Defendants are GoSmith, Inc. (a Delaware corporation), Porch.com, Inc. (which acquired GoSmith as a wholly owned subsidiary in 2017), Matthew Ehrlichman (CEO of Porch.com and GoSmith), Brenton Marrelli (CEO and co-founder of

3

GoSmith), and Darwin Widjaja (chief technology officer and co-founder of GoSmith, as well as VP of Porch.com).

GoSmith's and Porch.com's business model is to sell client leads to home improvement contractors for plumbing, landscaping, painting, and other home improvement services. Between 2012 and 2019, GoSmith scraped websites such as Yelp.com, YellowPages.com, and BBB.org for contact information of over ten million home improvement contractors. GoSmith stored the contact information on a database and sent automated text messages to contractors who had cell phone numbers. A typical text message read, "[Name] is wanting [service] in [city]. You have 1st priority. Reply 1 if interested, 3 if not." If a contractor receiving the text message was interested in learning more about the lead, GoSmith offered the option of purchasing "appointment credits" (priced at $8 per credit on at least one occasion) to connect the contractor with the potential client.

Plaintiffs allege that they have "residential [cell] phone numbers which [they] use in their home-based[] businesses." GoSmith sent 7,527 text messages to plaintiffs' cell phone numbers using an ATDS. Fifteen of the plaintiffs had registered their numbers on the national do-not-call registry. Those plaintiffs received 2,754 text messages from GoSmith on their registered numbers. All plaintiffs received more than one text message from GoSmith within a 12-month

4

period. None of the plaintiffs had provided their cell phone numbers to GoSmith or had consented to receiving text messages from GoSmith.

Plaintiffs filed suit in district court in 2020. Their complaint alleges that defendants' use of ATDS to send automated text messages to plaintiffs' cell phones violated (and continues to violate) § 227(b); and that defendants' text messages to plaintiffs' cell phones that were (and are) registered on the national do-not-call registry violated (and continue to violate) § 227(c). Plaintiffs seek damages and injunctive relief under both § 227(b) and (c).

Defendants moved to dismiss, contending *inter alia* that plaintiffs lack Article III and statutory standing. The district court assumed that plaintiffs have Article III standing, but held under the "zone of interests" test of *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), that plaintiffs lack statutory standing under the TCPA. The district court dismissed plaintiffs' complaint with prejudice. Plaintiffs timely appealed.

## II. Standard of Review

We review *de novo* a motion to dismiss, "accepting as true all well-pleaded allegations of material fact and construing those facts in the light most favorable to the non-moving party." *Judd v. Weinstein*, 967 F.3d 952, 955 (9th Cir. 2020) (citing *Puri v. Khalsa*, 844 F.3d 1152, 1157 (9th Cir. 2017)).

III.  Analysis

A.  Article III Standing

We first address Article III standing.  "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (alteration in original) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).  "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* (alteration in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000)).  An allegation of a bare procedural violation is not enough to satisfy Article III because the injury "must affect the plaintiff in a personal and individual way" and must be "de facto" (that is, "actually exist").  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 340 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)).

We have previously considered what constitutes an injury under the TCPA for purposes of Article III.  *See Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d

6

1037 (9th Cir. 2017). We wrote in *Van Patten* that in enacting the TCPA, Congress "establishe[d] the substantive right to be free from certain types of phone calls and texts absent consumer consent . . . [and] identified unsolicited contact as a concrete harm." *Id.* at 1043. "A plaintiff alleging a violation under the TCPA 'need not allege any *additional* harm beyond the one Congress has identified.'" *Id.* (quoting *Spokeo*, 578 U.S. at 342). "[A]n effective consent is one that relates to the same subject matter as is covered by the challenged calls or text messages." *Id.* at 1044–45. Importantly, "providing a phone number in itself [does not mean] that the consumer has expressly consented to contact for any purpose whatsoever": Instead, the scope of consent is "related to the reason [the plaintiff] gave his number in the first place." *Id.* at 1045–46.

Defendants argue that plaintiffs lack Article III standing because they have solicited business inquiries from potential customers and therefore have not suffered a concrete and particularized injury in receiving solicitations from defendants. We disagree. Plaintiffs allege in their complaint that they received unsolicited, unconsented automated text messages from GoSmith on their cell phones. Even assuming that GoSmith acquired plaintiffs' phone numbers through publicly available online directories, plaintiffs did not provide "prior express consent" as we construed that phrase in *Van Patten*. By posting their cell phone

7

numbers on Yelp or Facebook, plaintiffs advertised their businesses to clients who needed home improvement services. They did not expressly consent to receive text messages from GoSmith, which sought to sell information about potential clients.

Plaintiffs' alleged injuries are particularized. Defendants argue that the complaint alleges only a "generalized grievance," pointing out that plaintiffs calculate the approximate number of received text messages based on an assumption that each plaintiff received two messages per week. But the TCPA provides that even one unconsented message can violate the statute, and defendants have provided no basis, at this point in the litigation, to disbelieve plaintiffs' allegation that each of them has received at least one message. "A plaintiff alleging a violation under the TCPA 'need not allege any *additional* harm beyond the one Congress has identified'" to establish Article III standing. *Van Patten*, 847 F.3d at 1043 (quoting *Spokeo*, 578 U.S. at 342). Receiving even one unsolicited, automated text message from GoSmith is the precise harm identified by Congress. The harm plaintiffs have plausibly alleged is particularized because it "affect[s them] in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). Whether each plaintiff has, in fact, received one or more such messages is a matter for proof at a later stage of proceedings.

We therefore conclude that plaintiffs have alleged a concrete and particularized injury sufficient for Article III standing.

## B. Standing Under § 227(b)

All of the plaintiffs allege claims under § 227(b). Statutory standing requires a plaintiff to "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc.*, 572 U.S. at 129 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). "Whether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127 (internal quotation marks omitted).

In interpreting a statute, "we begin, as we must, with a careful examination of the statutory text." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721 (2017). In relevant part, § 227(b) provides:

> It shall be unlawful for any person within the United States . . . to make any call . . . using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service[.]

47 U.S.C. § 227(b)(1)(A)(iii). Section 227(b) further provides that "[a] person *or entity*" may recover money damages or obtain injunctive relief. *Id.* § 227(b)(3) (emphasis added). Using a plain language analysis and reading the statutory language in context, we conclude that under the most natural reading of the term,

9

"entity" includes a business. Section 227(b) thus covers calls to the cell phones of businesses as well as individuals.

Defendants argue, despite the language of the statute, that the TCPA protects only individuals from unwanted calls. They contend that plaintiffs, as home improvement contractors, fall outside of the TCPA's zone of interest. Defendants rely on legislative history, pointing to general statements in Senate and House reports suggesting that Congress did not intend to disrupt normal business communications. But where, as here, "the words of the statute are unambiguous, the 'judicial inquiry is complete.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)). Because the statutory text includes not only "person[s]" but also "entit[ies]," we conclude that all of the plaintiffs have standing to sue under § 227(b) of the TCPA.

### C. Standing Under § 227(c)

Those plaintiffs who have placed their cell phone numbers on the national do-not-call registry allege additional claims under § 227(c). Noting, correctly, that § 227(c) and its implementing regulations apply only to "residential" telephone subscribers, defendants argue that because plaintiffs use their cell phones both for personal calls and for calls associated with their home improvement businesses, they do not qualify as residential subscribers.

Section 227(c) of the TCPA directs the FCC to promulgate regulations under which "residential subscribers" may request that their telephone numbers be included in a national do-not-call registry and database, and to prohibit telephone solicitation to "any subscriber included in such database." 47 U.S.C. § 227(c)(3)(F). In relevant part, the FCC's implementing regulations provide:

> No person or entity shall initiate any telephone solicitation to:
>> . . .
>> (2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government.

47 C.F.R. § 64.1200(c)(2). FCC regulations protecting residential subscribers "are applicable to any person or entity making telephone solicitations or telemarketing calls to *wireless* telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991' [('2003 TCPA Order')]." 47 C.F.R. § 64.1200(e) (emphasis added). In the view of the FCC, expressed in the 2003 TCPA Order, "it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections," and "wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones." 2003 TCPA Order,

18 FCC Rcd. 14014, 14038 (2003). During oral argument, defendants conceded that cell phones can be "residential" for purposes of § 227(c).

The disputed question is whether a cell phone that is used for both business and personal purposes can be a "residential" phone within the meaning of § 227(c). In the 2003 TCPA Order, the FCC concluded that a cell phone registered on the do-not-call registry is presumptively a residential phone:

> As a practical matter, since determining whether any particular wireless subscriber is a "residential subscriber" may be more fact-intensive than making the same determination for a wireline subscriber, we will presume wireless subscribers who ask to be put on the national do-not-call list to be "residential subscribers." Such a presumption, however, may require a complaining wireless subscriber to provide further proof of the validity of that presumption should we need to take enforcement action.

*Id.* at 14039 (footnote omitted). In the wake of the 2003 TCPA Order, the Direct Marketing Association ("DMA") petitioned the FCC, asking it to exempt calls to business numbers that have been registered on the national do-not-call list. The FCC declined to do so, writing:

> [W]e disagree with the DMA that the rules should be revised to expressly exempt calls to business numbers. The 2003 TCPA Order [quoted above] provided that the national do-not-call registry applies to calls to "residential subscribers" and does not preclude calls to businesses. . . . We . . . decline to exempt from the do-not-call rules those calls made to "home-based businesses"; rather, we will review such calls as they are brought to our attention to determine whether or not the call was made to a residential subscriber.

12

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("2005 TCPA Order"), 20 FCC Rcd. 3788, 3793 (2005) (footnotes omitted). Thus, in the view of the FCC, a subscriber's use of a residential phone (including a presumptively residential cell phone) in connection with a home-based business does not necessarily take an otherwise residential subscriber outside the protection of § 227(c).

A few district courts have held, despite the view of the FCC, that a phone used for both personal and businesses purposes is not a residential phone for purposes of § 227(c). *See, e.g.*, *Worsham v. Disc. Power, Inc.*, No. RDB-20-0008, 2021 WL 50922, at *4 (D. Md. Jan. 6, 2021) ("Regardless of whether the . . . number is primarily used by [the plaintiff] for residential purposes, the number is also used for business, and business numbers are not permitted to be registered on the [do-not-call] registry."); *Shelton v. Target Advance LLC*, No. 18-2070, 2019 WL 1641353, at *6 (E.D. Pa. Apr. 16, 2019) ("The Phone Number is also for business use, and business numbers are not permitted to be registered on the National Do Not Call Registry."). However, the majority of district courts have concluded that a phone used for both personal and business purposes can still be regarded as residential within the meaning of § 227(c), depending upon the facts

and circumstances.  *See*, *e.g.*, *Mattson v. New Penn Fin., LLC*, No. 3:18-cv-00990-YY, 2020 WL 6270907, at *2 (D. Or. Oct. 25, 2020) ("Although [plaintiff's] use of a phone line for personal calls does not automatically transform it into a residential line for purposes of the TCPA, neither does his use of a personal line for business calls automatically transform it into a business line."); *Clements v. Porch.com, Inc.*, No. 1:20-cv-00003-SLG, 2020 WL 5739591, at *5 (D. Ala. Sept. 24, 2020) (holding that phones used for home-based businesses fall within the TCPA's zone of interest); *Smith v. Truman Rd. Dev., LLC*, No. 4:18-cv-00670-NKL, 2020 WL 2044730, at *12 (W.D. Mo. Apr. 28, 2020) (holding that a cell phone used at least 60 percent for personal purposes can be residential); *Blevins v. Premium Merch. Funding One, LLC*, No. 2:18-cv-377, 2018 WL 5303973, at *2–3 (S.D. Ohio Oct. 25. 2018) ("[C]ourts have routinely looked at the facts and circumstances surrounding a particular case before deciding whether TCPA protection extended to a particular telephone number that was used for both business and residential purposes."); *see also Bank v. Indep. Energy Grp. LLC*, No. 12-cv-1369, 2014 WL 4954618, at *3 (E.D.N.Y. Oct. 2, 2014) (holding that phones registered as "residential" qualify as "residential" within the meaning of the TCPA as long as the subscriber does not hold out such numbers to the public as a business line).

14

Relying on the FCC's regulations and orders, we agree with the view of the majority of the district courts and conclude that a presumptively residential cell phone can be residential even when used for both personal and business purposes. However, the FCC has not made clear, when a phone is used for both purposes, how to determine whether a phone is "residential." The FCC has indicated that there is a presumption that "wireless subscribers who ask to be put on the national do-not-call list [are] 'residential subscribers.'" 2003 TCPA Order, 18 FCC Rcd. at 14039. But it has so far declined to provide precise guidance for determining whether mixed-use phones are residential, stating only that "we will review such calls as they are brought to our attention to determine whether or not the call was made to a residential subscriber." 2005 TCPA Order, 20 FCC Rcd. at 3793.

As may be seen from the cases cited above, in assessing whether mixed-use phones are "residential" within the meaning of § 227(c), district courts have considered: (1) whether plaintiffs have held out to the public or advertised their phone numbers for business purposes; (2) whether plaintiffs' phones are registered with the telephone company as residential or business lines, including whether the phones are part of a family usage plan; (3) whether, and the extent to which, plaintiffs use their phones for business transactions or employment; (4) whether, and the extent to which, plaintiffs' employers (or other business entities) pay for or

reimburse plaintiffs for their phone bills. *See, e.g.*, *Shelton*, 2019 WL 1641353, at *6; *Bank*, 2014 WL 4954618, at *3; *Worsham*, 2021 WL 50922, at *4; *Smith*, 2020 WL 2044730, at *11; *Mattson*, 2020 WL 6270907, at *2; *Southwell v. Mortg. Invs. Corp.*, No. C13–1289, 2014 WL 4057166, at *3 (W.D. Wash. Aug. 14, 2014).

We know, as discussed above, that the FCC has concluded that a cell phone is presumptively residential. We also know, as discussed above, that the FCC has concluded that a phone—whether a landline or a cell phone—can be residential even when used for both personal and business purposes. What we do not know, because the FCC has explicitly declined to say, is when a mixed-use phone—whether a landline or a cell phone—ceases to become a residential phone and becomes a business phone. In the absence of FCC guidance on this precise point, we hold that plaintiffs' registered cell phones that are used for both personal and business purposes are presumptively "residential" within the meaning of § 227(c).

Defendants may overcome the presumption by showing that plaintiffs use their cell phones to such an extent and in such a manner that the presumption is rebutted. That is, defendants may rebut the presumption and show that the cell phone is a business line. Consistent with the decisions of most district courts to have addressed the issue, in determining whether the presumption is rebutted, we

16

will consider the following factors: (1) how plaintiffs hold their phone numbers out to the public; (2) whether plaintiffs' phones are registered with the telephone company as residential or business lines; (3) how much plaintiffs use their phones for business or employment; (4) who pays for the phone bills; and (5) other factors bearing on how a reasonable observer would view the phone line. The FCC is free in future regulations or orders to interpret § 227(c) differently. If the FCC does so, we will of course defer to its interpretation, provided that the interpretation is consistent with a reasonable understanding of the statutory language. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

The complaint alleges that some of the plaintiffs have placed their "residential" cell phone numbers on the national do-not-call registry. At the motion to dismiss stage and based on the particular allegations in the plaintiffs' complaint, plaintiffs' phones are presumptively residential for purposes of § 227(c). We therefore conclude that these plaintiffs have standing to sue under § 227(c). After discovery, defendants may seek to argue that they have rebutted the presumption by showing that plaintiffs' cell phones are used to such an extent and in such a manner as to be properly regarded as business rather than "residential" lines.

Conclusion

17

We hold that plaintiffs have standing under Article III. We also hold that plaintiffs have statutory standing under § 227(b) and (c) of the TCPA. We REVERSE and REMAND to the district court for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

*Chennette v. Porch.com*, No. 20-35962

FILED

OCT 12 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

BRESS, Circuit Judge, concurring:

I write separately to address the dissent's unfounded claims that the majority opinion "usurps the role of the Federal Communications Commission" and enacts a regulatory framework that is based on the majority's "own policy preferences." Dissent 1, 17. Whatever the place of such rhetoric when warranted, it is decidedly unwarranted here. Indeed, if anything, it is the dissent that commits the very errors for which it attacks the majority.

Section 227(c) of the TCPA applies to "residential telephone subscribers." 47 U.S.C. § 227(c). The FCC has passed regulations making clear that "wireless telephone numbers" qualify as "residential telephone subscribers." 47 C.F.R. § 64.1200(e). The plaintiffs are persons who run home-based businesses, who use their cell phone numbers for business and personal use, and who signed up for the national do-not-call registry. The question that divides us is how to determine whether these persons are "residential telephone subscribers" subject to the TCPA's corresponding protections.

The majority correctly holds, based on a proper interpretation of the FCC's guidance, that in answering this question, courts must examine whether the plaintiffs use their cell phones in such a manner as to be properly regarded as business phones rather than residential lines for personal use. Maj. Op. 16–18. For its part, the

1

dissent would seemingly ask whether the subscriber physically uses her cell phone only in her home—which nobody does. Dissent 12–14. The dissent's position reflects a severe misreading of the FCC's guidance, and one that no court to my knowledge has ever embraced. The dissent's criticisms of the majority opinion are not only overstated, they are groundless.

The dissent errs at the outset by asserting that there is a sharp distinction between "residential telephone subscribers" and cell phones under the TCPA. Dissent 4–8. According to the dissent, "[a] cell phone, which is mobile and not connected to a house, fixed abode, or dwelling, is not 'residential' under the definitions provided by dictionaries current when the TCPA was enacted." Dissent 5. Citing phone installation guides and legislative history, the dissent tells us there is a "common understanding that residential telephones are distinct from cell phones." Dissent 6. The dissent further maintains that "[t]he statutory context of the TCPA also makes clear that the term 'residential telephone subscriber' did not refer to a wireless telephone subscriber." Dissent 7.

The dissent uses this claimed distinction to harness its entire analysis, but there is a major problem: the FCC has ruled that cell phones *can be* regarded as residential telephones under the TCPA. Indeed, the source of that rule is none other than the 2003 TCPA Order, *see* In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd. 14014 (2003), the very order that the

dissent accuses the majority of disregarding. Contrary to the dissent's attempt to drive a wedge between "residential telephone subscribers" and cell phone users, the 2003 TCPA Order ruled that wireless users may receive the protections afforded to residential subscribers. That Order expressly concludes that "Congress has indicated its intent to provide significant protections under the TCPA to wireless users," and that "[a]llowing wireless subscribers to register on a national do-not-call list *furthers the objectives of the TCPA*." 2003 TCPA Order at 14037–38 (emphasis added). The FCC "believe[d] it [was] more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the *full range of TCPA protections*." *Id.* at 14039 (emphasis added). The FCC was thus clear: when it comes to the protections afforded under § 227(c), "*[w]e believe that wireless subscribers should be afforded the same protections as wireline subscribers*." *Id.* at 14116 (emphasis added). The dissent nowhere claims the FCC's interpretation is unreasonable. But for all its talk about deferring to the agency, the core premise of the dissent's analysis is one the FCC has flatly rejected.

We can see this more granularly in the dissent's treatment of § 227(b)(1), which generally makes it unlawful for a person to make a call using an automatic telephone dialing system to "any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). The dissent reasons that "[t]his language indicates that Congress knew how to refer to cellular telephones when it

3

wanted to, and that it chose not to use that terminology in describing the types of persons (residential telephone subscribers) whose privacy would be protected under § 227(c)." Dissent 7. But the FCC drew the opposite inference from § 227(b)(1). In concluding that Congress intended that the TCPA's residential telephone subscriber protections extend to wireless users, the FCC cited § 227(b)(1) as evidence that "had Congress intended to *exclude* wireless subscribers from the benefits of the TCPA, it knew how to address wireless services or consumers explicitly." 2003 TCPA Order at 14038 (emphasis added). Notwithstanding the dissent's professed fidelity to agency interpretation, the entire set-up for the dissenting opinion is effectively an attack on the FCC's threshold determination that wireless users may be treated as "residential telephone subscribers." Yet even the defendants in this case have conceded that cell phones can be "residential" for purposes of § 227(c).

Because it is clear that binding FCC rulings require that the TCPA's protections for residential telephone subscribers extend to wireless users, the question becomes: which cell phone users? In its implementing regulation, the FCC stated that the TCPA's protections for residential telephone subscribers "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the [2003 TCPA Order]." 47 C.F.R. § 64.1200(e). Seemingly influenced by its apparent view that

4

cell phones should not be considered "residential" telephones at all, the dissent claims that the 2003 TCPA Order should be read as extending the TCPA's protections "only" to wireless subscribers who use their cell phones "in their homes," such that it is "the location of the phone" that matters. Dissent 13, 15, 17. But that is not what the 2003 TCPA Order says.

In that Order, the FCC specifically recognized that "consumers carry their cell phones on their persons, to work, and while driving." 2003 TCPA Order at 14114.[1] Indeed, the FCC concluded that "it is well-established that wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones." *Id.* at 14038. In connection with the FCC's clear understanding that cell phone use extended beyond the home, the FCC in its 2003 TCPA Order specifically addressed an industry comment from Nextel that the FCC "should define 'residential subscribers' to mean 'telephone service used primarily for communications *in the subscriber's residence*.'" *Id.* (emphasis added). But the FCC specifically rejected Nextel's definition of "residential subscribers" as "far too restrictive and inconsistent with the intent of section 227." *Id.* The FCC thus

---

[1] The dissent claims "this is a quotation from commenters, not the FCC." Dissent 16. That is not true. And the proposition that people carry cell phones wherever they go is hardly controversial and fully consistent with the FCC's entire approach in the 2003 TCPA Order.

5

effectively rejected the very interpretation that the dissent now claims the 2003 TCPA Order somehow requires.

The dissent claims that the "full context" of Nextel's comment shows that the FCC "merely rejected the view that a wireless service must *replace* a land line to qualify as a residential telephone." Dissent 13 n.4. That is not accurate. In its submission to the FCC, Nextel argued that the "plain and ordinary meaning" of "residential telephone subscriber" "is telephone service used primarily for communications in the subscriber's residence," which Nextel claimed was consistent with Congress's "principal concern with residential privacy." Nextel Communications, Inc., Comments on In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 at 19 (Dec. 9, 2002), https://www.fcc.gov/ecfs/file/download/6513396853.pdf?file_name=6513396853.pdf. Based on this alleged legislative "focus on residential privacy" within "*the home*"—a phrase that Nextel italicized frequently in its submission (just like the dissent does)—Nextel argued that the FCC should "limit its regulation of calls to wireless customers to those narrow circumstances in which a wireless number clearly is being used primarily for calling within a residence." *Id.* at 20, 22–23 (emphasis in original). These are the same arguments the dissent makes now. But the FCC rejected Nextel's position. And contrary to the dissent, there is no basis to believe that the FCC misinterpreted Nextel's clearly stated position. Dissent 13 n.4.

Instead, when the FCC discussed how cell phones were commonly used outside the home and the "well-established" fact that "wireless subscribers often use their wireless phones in the same manner in which they use their residential wirelines phones," *id.*, the FCC was referring to the purposes for which the phones are used, which is to say, personal use. Indeed, the FCC went so far as to "presume [that] wireless subscribers who ask to be put on the national do-not-call list [are] 'residential subscribers.'" *Id.* at 14039. All of this explains why the majority opinion properly directs the district court to consider *how* the plaintiffs' cell phones were used ("in the same manner"), not *where* they are used.

The dissent's position, meanwhile, is not easily reconciled with the FCC's presumption that wireless subscribers on the do-not-call list are "residential subscribers." That regulatory presumption makes little sense if the TCPA's do-not-call protections are limited to cell phone users who use their phones only inside their homes, which common experience tells us is few people, if any. *See also id.* at 14114 (FCC recognizing that "consumers carry their cell phones on their persons, to work, and while driving."); *Carpenter v. United States*, 138 S. Ct. 2206, 2218 (2018) (noting that individuals "compulsively carry cell phones with them all the time"); *Riley v. California*, 573 U.S. 373, 385 (2014) (recognizing that cell phones are "now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy"). We "presume"

something when it is likely to be true. Why would the agency "presume" that wireless subscribers on the do-not-call list are "residential subscribers" if that presumption would almost always be wrong, as would be the case if the dissent's test were the law?

The dissent's other efforts to pry a location-based test out of the 2003 TCPA Order are equally wrong. The dissent claims it is "clear" that the FCC's "central rationale" for adopting a do-not-call registry "was to protect the privacy of consumers *in their homes*." Dissent 10 (emphasis added). But the dissent cherry picks from the 2003 TCPA Order. In language from the Order that the dissent omits, the FCC explained that "although Congress expressed concern with residential privacy, it also was concerned with the nuisance, expense and burden that telephone solicitations place on consumers." 2003 TCPA Order at 14039. Indeed, throughout the 2003 TCPA Order, the FCC references "*consumer* privacy" interests and needs, without limiting those interests and needs to privacy in the home. *Id.* at 14017–18, 14028–29, 14033, 14041–42, 14044–45, 14048, 14086, 14109, 14138, 14152–53, 14162–63; *see also id.* at 14128 ("The legislative history indicates that one of Congress' primary concerns was to protect the public from bearing the costs of unwanted advertising."). It is thus irrelevant, as the dissent maintains, that the FCC in its 2003 TCPA Order did not provide a "clear indication" that it wished to protect consumers who are talking on the phone while driving to work. Dissent 11 n.3. A

8

fair reading of the 2003 TCPA Order shows that the FCC was concerned with protecting consumers generally, regardless of where they happened to be when an unwanted call reached them. And in all events, the FCC did specifically recognize that consumers carry their cell phones "to work, and while driving." *Id.* at 14114.

To support its "home-based" theory, the dissent also cites the separate statement of FCC Chairman Michael Powell that the TCPA gives consumers the tools they need to "'build a high and strong fence *around their homes* to protect them from unsolicited telephone calls.'" Dissent 10–11 (quoting 2003 TCPA Order at 14174, separate statement by Chairman Powell) (emphasis in dissenting opinion). But the dissent leaves out what Chairman Powell said several lines later: "Our goal: to maximize consumers' ability to control the messages they receive on their personal phones and faxes." 2003 TCPA Order at 14174. In short, the dissent's reading of the FCC's motivating purpose is far too narrow and belied by the 2003 TCPA Order itself. The FCC's broader concerns with consumer privacy explain why the FCC concluded that wireless subscribers should "benefit from the full range of TCPA protections," *id.* at 14039, and not only when they use their fully portable cell phones in their homes. The majority opinion is fully consistent with the FCC's objective of "maximizing consumer privacy." *Id.* at 14017. The dissent's position is not.

The dissent's other points turn on a similar miscasting of the FCC's guidance. The dissent claims that "[t]he FCC indicated that wireless telephones could be protected, *but only* to the extent they were analogous to residential telephones," *i.e.*, through their use in the home. Dissent 11 (emphasis added). Later, the dissent maintains that "the FCC's description . . . in the 2003 TCPA Order indicated that a wireless subscriber would qualify as a residential subscriber *only* if the subscriber uses the phone 'in their home' and 'in the same manner' as a residential land line, i.e., within or connected to the house." Dissent 13 (emphasis added) (quoting the 2003 TCPA Order, 18 FCC Rcd. at 14038–39).

These "only[s]" are the dissent's, and the dissent's alone. And the FCC did not adopt the dissent's "within or connected to the house" caveat, either. Nothing in the 2003 TCPA Order limits the residential telephone subscriber protections to cell phones used only in homes. In fact, as I have noted, the FCC expressly rejected Nextel's position that "residential subscribers" should mean "'telephone service used primarily for communications in the subscriber's residence.'" *See* 2003 TCPA Order at 14038. The dissent claims that the 2003 TCPA Order "cover[s] wireless phones that are analogous to residential landline phones because they are used 'in their homes' and 'in the same manner in which [individuals] use their residential wireline phones.'" Dissent 17 (quoting the 2003 TCPA Order at 14038) (second

10

alteration in original).  But stitching together fragments of different sentences from the 2003 TCPA Order does not establish that the FCC endorsed the dissent's test.

Lacking any support in the 2003 TCPA Order for its preferred interpretation, the dissent tries to score points by criticizing the majority's test.  The dissent's critiques do not withstand scrutiny.  The dissent suggests that the majority opinion is wrong to focus on how a phone is used because "a home-based business phone could still be residential."  Dissent 19 (citing In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991 ("2005 TCPA Order"), 20 FCC Rcd. 3788, 3793 (2005)).  But under the majority opinion, a home-based business can still be "residential" depending on how the phone is used.  *See* Maj. Op. 16 (explaining that a wireless phone "can be residential even when used for both personal and business purposes").  That is fully consistent with the FCC's fact-intensive, case-by-case approach.  *See* 2003 TCPA Order at 14039; 2005 TCPA Order at 3793.  That some phones used for home-based businesses could—on a case-by-case basis—still be covered does not "indicate[] that the purpose for which the phone [is] used [is] not dispositive."  Dissent 14.  It simply indicates that phones do not invariably lose § 227(c)'s protection anytime they receive business calls.  Instead, the inquiry

11

depends on the facts and circumstances of how the phone is used, as the majority

opinion correctly reasons.[2]

This explains why the dissent further errs in claiming that the majority opinion

"broadly allow[s] anybody who owns a cell phone to sue telemarketers under the

TCPA." Dissent 2. It was of course the FCC who ruled that "wireless subscribers

should be afforded the same protections as wireline subscribers." 2003 TCPA Order

at 14116. But regardless, the majority opinion holds only that "based on the

particular allegations in the plaintiffs' complaint, plaintiffs' phones are

presumptively residential for purposes of § 227(c)." Maj. Op. 17. The majority then

allows the defendants to show that the "plaintiffs' cell phones are used to such an

extent and in such a manner as to be properly regarded as business rather than

'residential' lines." Maj. Op. 17–18. The majority opinion does not allow "all"

wireless subscribers to fall within § 227(c), as the dissent claims, Dissent 16, but

---

[2] The dissent acknowledges that the FCC would conduct a case-by-case analysis to determine whether a call to a home-based business was made to a "residential subscriber." Dissent 15–16 (citing the 2005 TCPA Order at 3793). This case-by-case analysis applies to wireless and landline phones alike. 2005 TCPA Order at 3973; Maj. Op. 16. But under the dissent's "location-based" approach, a landline for a home-based business would always be physically located in the home and hence "residential." This would not only effectively pretermit the FCC's anticipated case-by-case review, it would be inconsistent with the FCC's determination that business-to-business communications are outside of § 227(c)'s protections. *See* 2005 TCPA Order at 3790, 3793; Maj. Op. 12–13.

instead sets forth a framework based on the FCC's guidance for determining which wireless users are covered.

Equally inapt is the dissent's claim that the majority has chosen factors for consideration "based on its own policy preferences." Dissent 17. That is of course untrue. I have no horse in this race. The fact is that while the FCC has rejected the dissent's "location-based" test and endorsed a test based on how the wireless phone is used, the FCC has not specified the factors courts should apply in conducting that analysis. Maj. Op. 15. In articulating factors that courts may consider in the case-by-case, fact-intensive analysis that the FCC directed, the majority opinion did not "appropriat[e] [the] agency's rulemaking function," as the dissent charges. Dissent 20 n.7. Instead, and until the FCC provides more definitive guidance, the majority opinion simply identifies some of the obvious factors that anyone would consider under a purpose/use test—the same factors numerous other courts have likewise identified.[3] Maj. Op. 15–17 (citing cases). The dissent's high-flying rhetoric about deference to the agency rests on its mistaken belief that the FCC's regulations and orders are on the dissent's side, rather than against it.

To this point, the many district courts that have now considered this issue have based their analyses around how the cell phones were used, the same approach the

---

[3] In some instances, a given factor would presumably prove dispositive, such as if a user registered the cell phone in the name of a business entity or engaged in extensive business marketing efforts that listed the cell phone as a business number.

majority adopts here. *See* Maj. Op. at 13–15. Meanwhile, the dissent cites no case adopting its "location-based" approach. Indeed, even the defendants here did not advocate for such a rule. They instead maintained that in this case, the plaintiffs were not "residential subscribers" because they held out their phone numbers as business lines. The defendants may ultimately be right, but it is premature to make that determination at the Rule 12(b)(6) stage and without discovery.

*     *     *

The majority opinion is correct to conclude that wireless users may be "residential subscribers" depending on how they use their phones. This conclusion is supported by the FCC's guidance, the conclusions of other courts, and plain common sense. The dissent is long on accusations but comes up short in interpreting the very FCC rulings that it uses as its mantle.

With these additional observations, I concur in the majority opinion.

*Chennette v. Porch.com, Inc.*, No. 20-35962

IKUTA, Circuit Judge, dissenting in part:

FILED

OCT 12 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

The majority today usurps the role of the Federal Communications

Commission (FCC) and creates its own regulatory framework for determining

when a cell phone is actually a "residential telephone," instead of deferring to the

FCC's narrower and more careful test.

The issue is whether plaintiffs have a cause of action under the Telephone

Consumer Protection Act of 1991, 47 U.S.C. § 227 (TCPA) for receipt of

unauthorized text messages on their cell phones, which plaintiffs allege violates

regulations promulgated by the FCC.  Congress authorized the FCC to promulgate

regulations protecting "residential telephone subscribers' privacy rights to avoid

receiving telephone solicitations to which they object."  47 U.S.C. § 227(c)(1).

The FCC exercised this authority by promulgating regulations that (1) allowed

"residential telephone subscribers" to place their telephone numbers on a national

Do Not Call (DNC) registry, and (2) made it a violation for solicitors to call such

numbers absent an exception.  47 C.F.R. § 64.1200(c).  The FCC's rule also

applied "to wireless telephone numbers," but only "to the extent described" in an

order issued by the FCC in 2003, *see* In Re Rules & Reguls. Implementing the Tel.

Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14033 (2003) (referred to here

as the "2003 TCPA Order").  Instead of deferring to the 2003 TCPA Order which

extended the protections of the national DNC registry to wireless telephones only to the extent they were similar to residential telephones, a reasonable interpretation of the TCPA, the majority has leaped over the FCC's limitations to provide its own, much laxer, regulatory framework and procedures that broadly allow anybody who owns a cell phone to sue telemarketers under the TCPA.

Because we are bound to defer to the FCC's approach, which is consistent with the TCPA, and may not substitute our own reasoning for that of the agency, I dissent.

## I

Congress enacted the TCPA, in December 1991, to "proscribe[] abusive telemarketing practices," including the practice of making unauthorized telephone solicitations. *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021). The key provision at issue here authorized the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

Where, as here, Congress "has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron, U.S.A., Inc. v. Nat. Res. Def.*

2

*Council, Inc.*, 467 U.S. 837, 843–44 (1984). "Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844. Of course, the agency must "fill the statutory gap in reasonable fashion," *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 980 (2005), and cannot "adopt a regulation that bears no relationship" to the statute's language and purpose. *Batterton v. Francis*, 432 U.S. 416, 428 (1977). But provided the agency fills the gap in a manner that "is reasonable, in light of the language, policies, and legislative history of the [TCPA]," *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131–33 (1985), the agency's interpretation qualifies for *Chevron* deference. Thus, if the agency's action "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron*, 467 U.S. at 845 (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1961)).

A court, by contrast, lacks the authority to make up for any deficiencies or ambiguities in the agency's interpretation. We presume "that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities," not the courts, because the agencies have a comparative advantage

over courts in making such policy judgments, have political accountability, and are able to provide a uniform interpretation. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2412–13 (2019). Therefore, "when new issues demanding new policy calls come up within" a regulatory scheme, we presume that the agency, and not the courts, should "take the laboring oar." *Id.* at 2413.

Here, the TCPA gave the FCC authority to fill a gap in the statute. If the FCC's gap-filling regulatory and rulemaking efforts were reasonable and not "manifestly contrary" to the statute, then the FCC is entitled to deference. *Chevron*, 467 U.S. at 844. We are obliged to uphold them as written, and refrain from exercising our own ingenuity and policymaking judgments to "fill out the statutory scheme," *Kisor*, 139 S. Ct. at 2413.

## A

To determine whether the FCC's regulations are reasonable in light of TCPA's "language, policies, and legislative history," *Riverside Bayview Homes, Inc.*, 474 U.S. at 133, it is necessary to first understand the provisions of the TCPA at issue.

The TCPA authorized the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights," 47 U.S.C. § 227(c)(1). The statute does not define the key term "residential

telephone subscribers." At the time Congress enacted the TCPA, the most applicable dictionary definition for "residence" was "[a] house where one's home is; a dwelling house." *Residence*, *Black's Law Dictionary*, *Sixth Edition* (1990). The dictionary defines the word "residential" to mean "of, relating to, or connected with residence or residences." *Residential*, *Webster's Third New International Dictionary* (1981). Thus, a "residential telephone" is by its terms a telephone connected with a residence. A cell phone, which is mobile and not connected to a house, fixed abode, or dwelling, is not "residential" under the definitions provided by dictionaries current when the TCPA was enacted.

This dictionary definition is confirmed by the common usage of the term. Although mobile phones were available in the 1990s when the TCPA was enacted, it was understood that a "residential telephone" referred to a land line at a residence.[1] The common understanding that the terms "residential" and

---

[1]Installation guides at the time assumed residential telephones were wired telephones. *See* Robert W. Wood, Home Electrical Wiring Made Easy: Common Projects and Repairs, 143 (1988) (referring to "[v]oltages powering a residential telephone service"); James L. Kittle, Mastering Household Electrical Wiring, 278 (1988) (referring to "residential telephone wiring systems"); UBM LLC, Local Area Network Magazine: LAN 1990-06: Vol. 5 Issue 6, 147 (1990) (commenting on the lacking "quality of most residential telephone wires"). The understanding that residential phones were land lines and distinct from wireless phones persisted for years after the enactment of the TCPA. *See, e.g.,* Crain Communications, Inc., Electronic Media 1996-04-29: Vol. 15 Issue 18, 28 (1996) (distinguishing "the

(continued...)

"residential telephone" refer to a land line in the home also finds support in statements made in connection with Congress's consideration of the TCPA. Senator Ernest Hollings, sponsor of the TCPA, referred to phones purchased "for the convenience of the individual home-owner" and to the need to protect such individuals' privacy specifically in the home.[2] Senator Lloyd Bentsen, a co-sponsor of the TCPA, differentiated between "unsolicited automated calls to the home" and "automated calls to . . . cellular telephones." 137 Cong. Rec. 30824 (1991) (statement of Sen. Bentsen). Senator Bentsen also listed "home, business, and cellular telephones" as separate types of telephones. *Id.*

Other statements made when Congress was considering the TCPA confirm the common understanding that residential telephones are distinct from cell phones. The director of the Congressional Budget Office (CBO) understood the

---

[1](...continued)
lucrative $45 billion wired residential telephone business" from the "$17 billion wireless telephone business"); R&D Magazine 1996-11: Vol. 38 Issue 12 (1996) (referring to "residential telephone wiring"); James T. Geier, Network reengineering: the new technical imperative, 158 (1996) (referring to "current residential telephone wiring").

[2]*S. 1462, the Automated Telephone Consumer Protection Act of 1991; S. 1410, the Telephone Advertising Consumer Protection Act; and S. 857, Equal Billing for Long Distance Charges: Hearings on S. 875, 1410, and 1462 Before the Subcomm. on Communications of the Senate Comm. on Commerce, Science, and Transportation*, 102nd Cong. 3 (1991) (statement of Sen. Ernest F. Hollings, Chairman, S. Comm. on Commerce, Science, and Transportation).

TCPA to ban "all prerecorded or automatically-dialed telephone calls" both to "cellular telephone numbers," and "to residential subscribers." S. Rep. No. 102-178, at 7 (1991). And in summarizing the "major provisions" of the TCPA, an appendix to a Senate hearing distinguished between provisions relating to cellular phones versus those relating to home phones. *Computerized Telephone Sales Calls and 900 Service: Hearings Before the Senate Comm. on Commerce, Science, and Transportation*, 102nd Cong. 67 (1991) (appendix summary of the TCPA).

The statutory context of the TCPA also makes clear that the term "residential telephone subscriber" did not refer to a wireless telephone subscriber. For instance, a section of the TCPA provides that it is unlawful for a person to make a call using an automatic telephone dialing system to "any telephone number assigned to a . . . cellular telephone service," with some exceptions. 47 U.S.C. § 227(b)(1)(A)(iii). This language indicates that Congress knew how to refer to cellular telephones when it wanted to, and that it chose not to use that terminology in describing the types of persons (residential telephone subscribers) whose privacy would be protected under § 227(c). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23

7

(1983) (citation omitted).

In short, the statutory language in § 227(c) directed the FCC to promulgate rules that would protect individuals who were "residential telephone subscribers," meaning subscribers to a telephone service connected to their residences, which was generally understood to be a land line connected to the home.

### B

The FCC acted within this statutory context when it promulgated regulations and rules to fill in the gap left by Congress in § 227(c). In its initial regulatory efforts in 1992, the FCC did not address wireless telephones, but promulgated procedures requiring the establishment of company-specific do-not-call (DNC) lists for residential telephones. Specifically, the FCC promulgated § 64.1200(e)(iii) (1992) to require telemarketing entities that received a do-not-call request from a "residential telephone subscriber" to place the request on an internal company-specific do-not-call list. 7 F.C.C.R. 8752, 8791–92 (1992). But after the Federal Trade Commission implemented a national DNC registry in 2003, which was subsequently approved by Congress, *see* Do-Not-Call Implementation Act, Pub. L. No. 108-10, 7 Stat. 557, the FCC issued an order stating that, in conjunction with the FTC, it was establishing a national DNC registry for consumers "who wish to avoid unwanted telemarketing calls." 2003 TCPA Order

8

at 14017. In connection with this change, the FCC promulgated a regulation

proscribing solicitations to any "residential telephone subscriber" who had

registered with a national DNC registry:

> (c) No person or entity shall initiate any telephone solicitation, as defined in paragraph (f)(9) of this section, to: . . .
>> (2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government. Such do-not-call registrations must be honored for a period of 5 years. . . .

2003 TCPA Order at 14146. The FCC's regulation was codified in 47 C.F.R.

§ 64.1200(c).

At the same time, the FCC decided to extend the protection of the national

DNC registry to individuals with wireless phones. Its 2003 revised regulation

stated:

> (e) The rules set forth in sections 64.1200(c) and 64.1200(d) [requirement for company-specific do-not-call list] are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers *to the extent described in the [2003 TCPA Order]*.

2003 TCPA Order at 14148 (2003) (emphasis added) (codified as § 64.1200(e)

with nonmaterial changes).

This regulation did not expressly describe the extent to which the protections

for a residential telephone subscriber applied to a wireless telephone subscriber and

9

instead merely incorporated the 2003 TCPA Order by reference. Therefore, the scope of § 64.1200(e) can be understood only in the context of the Order as a whole.

A review of the relevant sections of the 2003 TCPA Order makes clear that the FCC's central rationale for adopting a national DNC registry was to protect the privacy of consumers in their homes. For instance, the FCC noted it had received comments that "unwanted telephone solicitations have reached the point of harassment that constitutes an invasion of privacy within their homes," 2003 TCPA Order at 14030, and agreed that consumers should "be given the opportunity to determine for themselves whether or not they wish to receive telephone solicitation calls in their homes." *Id.* at 14035. More important, in responding to comments arguing that the national DNC registry regulations violated the telemarketers' First Amendment rights, the FCC relied in part on Supreme Court cases holding that "the government has an interest in upholding the right of *residents* to bar unwanted speech from their *homes*," *id* at 14053 (second emphasis added), and noted that "[t]he Supreme Court has 'repeatedly held that individuals are not required to welcome unwanted speech into their homes and that the government may protect this freedom.'" *Id.* (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)). In short, the FCC recognized that the DNC registry was a tool

10

consumers needed "to build a high and strong fence *around their homes* to protect them from unsolicited telephone calls." *Id.* at 14174 (separate statement by Chairman Michael K. Powell) (emphasis added).[3]

After discussing the central goal of protecting privacy in the home, the FCC turned to the question whether "the national database should allow for the registration of wireless telephone numbers," *id.* at 14037. The FCC indicated that wireless telephones could be protected, but only to the extent they were analogous to residential telephones. In this context, the FCC addressed an argument raised by Nextel (an industry commenter) that the FCC should define "residential subscribers" to mean "telephone service used primarily for communications in the

---

[3]The concurrence urges us to minimize the significance of the language in the 2003 TCPA Order indicating that the FCC's central purpose for adopting a national DNC registry was to protect the privacy of consumers in their homes. The concurrence argues that the 2003 TCPA Order refers to *"consumer* privacy" "without limiting those interests and needs to privacy in the home," and provides a laundry list of citations to the term "consumer" or "consumer privacy," *see* Concurrence at 8 (citing the 2003 TCPA Order at 14017–18, 14028–29, 14033, 14041–42, 14044–45, 14048, 14086, 14109, 14138, 14152–53, 14162–63, and 14128). But none of these citations provide a clear indication that the FCC intended for the national DNC registry to protect the privacy of a consumer who is talking on the phone (to a friend, colleague, or sales prospect) while driving to work. Rather, the 2005 TCPA Order referenced the central importance of consumer privacy in the home, reiterating that "[t]he do not call rules directly advance the government's substantial interests in guarding against fraudulent and abusive solicitations and facilitating the protection of consumer privacy in the home even when the product sought to be sold is a newspaper." 20 F.C.C. Rcd. 3788, 3793 (2005) (referred to here as the "2005 TCPA Order").

11

subscriber's residence." *Id.* at 14038. The FCC interpreted Nextel's argument to mean that the FCC's authority would be limited to regulating "solicitations to wireless subscribers in those circumstances where wireless service actually has *displaced* a residential land line, and functions as a consumer's *primary* residential telephone service." *Id.* (emphasis added). The FCC rejected this definition of "residential subscribers" as being too restrictive because "there is nothing in section 227 to suggest that only a customer's '*primary* residential telephone service' was all that Congress sought to protect through the TCPA." *Id.* (emphasis added). As the FCC explained, "under Nextel's definition, even consumers who use their wireless telephone service *in their homes to supplement their residential wireline service*, such as by using their wireless telephone service to make long distance phone calls to avoid wireline toll charges, would be excluded from the protections of the TCPA." *Id.* (emphasis added). Because "wireless subscribers often use their wireless phones *in the same manner* in which they use their residential wireline phones," *id.* (emphasis added), the FCC explained, such subscribers could participate in the national DNC list, *id.* at 14039, subject to a fact-intensive inquiry as to "whether any particular wireless subscriber is a

'residential subscriber,'" *id*.[4]

Due to the difficulty of determining whether a wireless subscriber is a residential subscriber, the FCC held it would "presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers,'" subject to "further proof of the validity of that presumption should we need to take enforcement action." *Id.* The FCC did not set forth what criteria would enable it to determine when a wireless subscriber was a residential subscriber.

In sum, the FCC's description of the applicability of the national DNC registry to cell phones in the 2003 TCPA Order indicated that a wireless subscriber would qualify as a residential subscriber only if the subscriber uses the phone "in

---

[4]The concurrence characterizes the FCC's response to Nextel's comment as "effectively reject[ing] the very interpretation that the dissent now claims the 2003 TCPA Order somehow requires" (that is, the requirement that a wireless phone may qualify as a residential telephone only if it is used in the same manner as a residential telephone, *see supra* at 11–13). Concurrence at 5–6; *see also* Concurrence at 10. The concurrence attempts to bolster its claim with a fuller version of Nextel's comment, derived from the administrative record underlying the 2003 TCPA Order. Concurrence at 6. But the concurrence's characterization of the 2003 TCPA Order is off the mark (and its reference to the administrative record is irrelevant). Whatever Nextel may have *intended* to convey in its comment, the FCC made clear that it understood the comment as arguing that a wireless service must *replace* a land line to qualify as a residential telephone. The FCC rejected this narrow requirement because consumers may "use their wireless telephone service *in their homes* to supplement their residential wireline service," a comment that highlights— rather than detracts from — the importance of the wireless phone's location. 2003 TCPA Order at 14039.

13

their home," *id.* at 14038, and "in the same manner" as a residential land line, i.e., within or connected to the house. *See id.* at 14038–39. Because this ruling closely links covered wireless numbers to residential telephone numbers, it avoids making too significant a departure from the statutory language (which referred to "*residential* telephone subscribers") so as to be "manifestly contrary" to the TCPA.

The FCC's subsequent ruling in 2005 did not materially change this description. Following the promulgation of regulations implementing the national DNC registry in 2003, the FCC received petitions for reconsideration of the 2003 Order. *See* 2005 TCPA Order at 3793. In dismissing these petitions, the FCC first reiterated that the national DNC registry did not violate the telemarketers' First Amendment rights because it did no more than permit a private individual to decide what solicitations to allow into the home, and "respected the right of a householder to bar" a solicitor from his home. *Id.* at 3792 (*quoting Rowan v. United States Post Office,* 397 U.S. 728, 737–39 (1970)). The FCC did not provide further clarification about when a wireless phone would qualify for the protection of the national DNC registry, but indicated that the *purpose* for which the phone was used was not dispositive, because a phone can be used for a "home-based business" and yet still be residential and entitled to protection in the national DNC registry. *Id.* For this reason, the FCC declined to make a per se exemption from

14

the national DNC registry for calls to business numbers, but stated that calls to a home-based business must be examined on a case-by-case basis "to determine whether or not the call was made to a residential subscriber." *Id.* at 3793. This explanation suggests that the location of the phone, rather than the *purpose* for which it was used, is critical for determining whether it merited protection.

C

Although the 2003 TCPA Order did not expressly delineate which wireless subscribers qualify as residential telephone subscribers, judicial humility requires us to make the effort to tease out the FCC's approach from the clues provided in the 2003 TCPA Order. The majority has not undertaken this task, and the concurrence focuses on arguments as to why the FCC could not have meant to limit "wireless subscribers" to subscribers who use their phones in their homes. None of the concurrence's arguments are persuasive.

First, the concurrence argues that there is no "wedge between 'residential telephone subscribers' and cell phone users," based on the FCC's statement that "[w]e believe that wireless subscribers should be afforded the same protections as wireline subscribers." Concurrence at 3. But this goes too far. The 2003 TCPA Order, read as a whole, does not come close to suggesting that protections for "residential telephone subscribers," 47 C.F.R. § 64.1200(c) and (d), would apply to

15

any person with a cell phone, regardless of the phone's location or use. Rather, the FCC made clear that it would first "determin[e] whether any particular wireless subscriber is a 'residential subscriber,'" and require the subscriber to "provide further proof of the validity of that presumption" before the FCC would deem the subscriber to be protected by the national DNC registry rules. 2003 TCPA Order at 14039. If all wireless subscribers were afforded the same protections as wireline subscribers, there would be no need for such a rebuttable presumption.

Second, the concurrence argues that we cannot consider the location of a wireless phone in determining whether it is a residential telephone, because "the FCC specifically recognized that 'consumers carry their cell phones on their persons, to work, and while driving.'" Concurrence at 5 (quoting 2003 TCPA Order at 14114). But contrary to the concurrence's statement, Concurrence at 5 n.1, this is a quotation from commenters, not the FCC. *See* 2003 TCPA Order at 14114 ("The vast majority of *consumer advocates* contend that telemarketing calls to cell phones are as intrusive of consumers' privacy interests as calls to landline phones. Some believe they are more so, as consumers carry their cell phones on their persons, to work, and while driving.") (emphasis added) (citing six commenters). The concurrence's remaining arguments fail to point to any clear statement that the FCC interpreted "residential telephone subscriber" to mean a

16

wireless subscriber who uses a cell phone at any location for any mixture of personal and business matters.

Rather, a close reading of the 2003 TCPA Order shows that, in exercising the authority delegated by Congress to promulgate rules "to protect residential telephone subscribers' privacy rights," 47 U.S.C. § 227(c)(1), the FCC balanced its obligation to provide a reasonable interpretation of the statutory language with its policy goal of recognizing changing technology. It struck this balance in § 64.1200(e) and the 2003 TCPA Order by covering wireless phones that are analogous to residential landline phones because they are used "in their homes" and "in the same manner in which [individuals] use their residential wireline phones." 2003 TCPA Order at 14038. Because this interpretation is reasonable, it merits our deference. Therefore, in determining whether plaintiffs have a cause of action under § 227(c), we should remand to the district court to determine in the first instance whether the plaintiffs' use of their wireless phones meets this interpretation.

## II

But instead of deferring to the FCC, the majority usurps its rulemaking powers by engaging in its own rulemaking efforts and developing a regulatory framework based on its own policy preferences. The concurrence sees nothing

17

wrong with helping the agency out by "simply identif[ying] some of the obvious factors that anyone would consider." Concurrence at 13. But the court is not authorized to create a regulatory framework based on what it deems to be the "obvious factors."[5] Concurrence at 13. The Supreme Court has long held that a "court does not simply impose its own construction on the statute," but instead defers to the agency's interpretation. *Chevron*, 467 U.S. at 843. And if the agency's interpretation is itself ambiguous, as it is here, the "power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2412 (2019) (*quoting Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 151 (1991). Contrary to the concurrence, this is inherently a policy-making role. Indeed, Congress's deference to an agency's interpretation of its own ambiguous regulations "stems from the awareness that resolving genuine regulatory ambiguities often 'entail[s] the exercise of judgment grounded in policy

---

[5]The concurrence suggests that when a regulation is ambiguous, a court may fill gaps with various factors so long as they are "factors that anyone would consider." *See* Concurrence at 13 (stating that "until the FCC provides more definitive guidance, the majority opinion simply identifies some of the obvious factors that *anyone would consider* under a purpose/use test—the same factors numerous other courts have likewise identified") (emphasis added). But because the FCC, not the judiciary, is authorized to resolve regulatory ambiguities, we have not been given the authority to fill out a regulatory standard, and it is irrelevant that multiple district courts have adopted similar factors.

concerns.'" *Id.* at 2413 (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). And because Congress "is attuned to the comparative advantages of agencies over courts in making such policy judgments," "when new issues demanding new policy calls come up within that scheme, Congress presumably wants the same agency, rather than any court, to take the laboring oar." *Id.* But contrary to the Supreme Court's "presumption that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities" *id.* at 2412, the majority here decides to take the laboring oar in its own hands.

The majority's first misstep is to discard the FCC's careful consideration about when wireless phones may be similar to residential phones, the terminology used in the TCPA. Instead, the majority ignores the TCPA's use of the word "residential" as referring to a physical location, and assumes that the term "residential" refers to the *purpose* for which a telephone is used, whether personal or business. Maj. at 11–12. The FCC, by contrast, has not adopted any such definition. To the contrary, the FCC has indicated that a home-based business phone could still be residential. *See* 2005 TCPA Order at 3793.

Based on this error, the majority claims that the central determination to be made in any case involving wireless phones listed on the national DNC registry is whether "plaintiffs use their cell phones to such an extent and in such a

19

manner . . . that the cell phone is a business line." Maj. at 16–17. Again, the FCC did not promulgate any such standard. *See* 2005 TCPA Order at 3793.

Adding the capstone on this erroneous edifice, the majority then elects to promulgate regulatory factors a court (or agency) can use to answer its newly fabricated question about purpose.[6] For instance, according to the majority, a court should consider "how much plaintiffs use their phones for business or employment," and whether plaintiffs "hold their phone numbers out to the public" as being used for business purposes. Maj. at 17. But under the ordinary use of language, the percentage of personal use, or whether the individual uses the phone for a home-based business, does not make a telephone residential or nonresidential. Nor did the FCC indicate that it would weigh such factors; rather, it merely said it would decide whether a wireless subscriber was a residential subscriber on a case-by-case basis.[7]

---

[6]The majority's factors are "(1) how plaintiffs hold their phone numbers out to the public; (2) whether plaintiffs' phones are registered with the telephone company as residential or business lines; (3) how much plaintiffs use their phones for business or employment; (4) who pays for the phone bills; and (5) other factors bearing on how a reasonable observer would view the phone line." Maj. at 17.

[7]In appropriating an agency's rulemaking function, the majority also invents factors without the benefit of evidence, such as the factor "whether plaintiffs' phones are registered with the telephone company as residential or business lines," without material record evidence suggesting that telephone companies consistently

(continued...)

In short, the majority speeds off without a backwards glance at the language of § 227(c) or § 64.1200(e), and uses the FCC's careful discussion of how wireless phones may qualify for the protection of the national DNC registry only as a launching pad for the majority's improvised regulatory creation. Such an approach is completely contrary to our judicial role, which is limited to deferring to the agency's policy-making authority, as delegated by Congress, without "helping" the agency by providing our own reasoning "that the agency itself has not given." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).[8]

Because I would defer to the FCC's rulemaking as consistent with the statute that Congress has promulgated, and refrain from engaging in our own (and contrary) effort to elaborate on the rules, I dissent.

---

[7](...continued)
engage in such registration. Maj. at 17.

[8]It is ironic that the majority concludes that it will defer to the FCC's future interpretation "provided that the interpretation is consistent with a reasonable understanding of the statutory language," given that the majority itself fails to put forth such a consistent interpretation. Maj. at 17.

21